**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | Civil No. _____ |
| | ) | |
| Plaintiff, | ) | |
| | ) | PETITION FOR REVIEW |
| vs. | ) | OF AGENCY ACTION |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE ANIMAL AND PLANT | ) | |
| HEALTH INSPECTION SERVICE; | ) | |
| JANET L. BUCKNELL, in her official capacity | ) | |
| as Deputy Administrator of the Animal and | ) | |
| Plant Health Inspection Service, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**INTRODUCTION**

1.      WildEarth Guardians ("Guardians") brings this lawsuit against Defendants U.S. Department of Agriculture ("USDA") Animal and Plant Health Inspection Service ("APHIS") and Janet L. Bucknall, the Deputy Administrator for APHIS's Wildlife Services program.[1] Wildlife Services continues to kill predators and numerous other native wildlife species without supplementing stale environmental analyses that rely upon decades-old science for its so-called "Predator Damage Management" in New Mexico. In so doing, Wildlife Services is violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347; the implementing Council on Environmental Quality ("CEQ") regulations, 40 C.F.R. §§ 1500–1508; and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706.

_____

[1] Wildlife Services is a program or component of APHIS, within the USDA.  As all the allegations in this Complaint relate to the Wildlife Services program, which functions as a semi-autonomous agency, Defendants will hereinafter be collectively referred to as "Wildlife Services."

2.      Every year, Wildlife Services—a program within the USDA—poisons, traps, and guns down several of our nation's most majestic animals, including wolves, bears, coyotes, and mountain lions in a futile attempt to save livestock and other "resources." Funded with millions of taxpayer dollars, and without modern scientific support, this program uses cruel and often archaic methods to capture and kill wildlife from their native ecosystems, largely at the behest of livestock producers. Across New Mexico, Wildlife Services uses fixed-wing aircraft and helicopters to aerially shoot coyotes; body-gripping traps, neck snares and leghold traps to kill mountain lions, black bears, bobcats, badgers, coyotes, skunks, and swift and gray foxes; gas cartridges and poisons to exterminate coyotes, foxes, and prairie dogs in their dens; sodium cyanide M-44 devices to kill canines like foxes and coyotes; and other poisons to eliminate native birds like ravens. Family pets and federally-protected endangered and threatened species have been and will continue to be accidentally injured or killed by the agency's indiscriminate killing methods.

3.      Despite its extensive activities, Wildlife Services has never prepared an Environmental Impact Statement ("EIS") disclosing the breadth of environmental impacts from its New Mexico wildlife killing programs to the public as NEPA requires. Instead, it continues to operate in the state under outdated Environmental Assessments ("EAs") that rely on studies mostly dating back to the 1970s and 80s, but in some instances much earlier.

4.      NEPA, however, requires supplemental analysis when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(d)(l)(ii).[2] More than 14 years have passed

---

[2] The CEQ regulations cited herein were recently revised and became effective on September 14, 2020. *See* 85 Fed. Reg. 43304 (July 16, 2020) (Update to the Regulations Implementing the Procedural Provisions of the NEPA, Final Rule). There was little substantive change, however,

since Wildlife Services analyzed the environmental impacts of its New Mexico Predator Damage

Management ("PDM") Program in finalized NEPA documents. Also, more than 9 years have

passed since Wildlife Services separately analyzed the environmental impacts of its New Mexico

Aquatic Rodent Damage Management ("ARDM") program. New information and circumstances

relevant to its wildlife killing programs, such as new scientific publications on the

ineffectiveness of lethal predator control and the negative cascading ecological consequences of

removing keystone species from their native ecosystems, require that Wildlife Services prepare

supplemental NEPA analyses.

5.     Through this Complaint, Guardians seeks a declaration that Wildlife Services'

ongoing authorization and implementation of its wildlife killing programs in New Mexico

violates federal law and is otherwise arbitrary and capricious. Guardians additionally seeks

injunctive relief to redress the injuries caused by these violations of the law. Should Guardians

prevail, it will seek an award of costs, attorneys' fees, and other expenses pursuant to the Equal

Access to Justice Act, 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

6.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question

jurisdiction) and 5 U.S.C. §§ 701 *et seq*. (Administrative Procedure Act). It has authority to issue

declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. §§ 701–706.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because a

substantial part of the agency's violations of law occurred and continue to occur in this district

---

to the "supplemental NEPA analysis" regulation at issue here. *Compare* 40 C.F.R. § 1502.9
(1978) to 40 C.F.R. § 1502.9 (2020).

and injury to Guardians and its members occurred and continues to occur in this district. Guardians also maintains an office in this district.

**PARTIES**

8.      Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit conservation organization dedicated to protecting and restoring the wildlife, wild places, wild rivers, and the health of the American West. Guardians has been headquartered in Santa Fe, New Mexico for more than 30 years, with numerous staff members currently working and residing in New Mexico. Guardians also has more than 188,000 members and supporters across the West, including thousands of members and supporters who reside in and/or visit the State of New Mexico. Guardians has a long history of working to protect and restore native wildlife species across the West in general and New Mexico in particular, including Mexican gray wolves, mountain lions, black bears, coyotes, beavers, and prairie dogs. Guardians operates a wildlife program with campaigns focused on native carnivore protection and restoration, and on reining in the controversial, cruel, and destructive practices of Wildlife Services including the use of poisoning, trapping, and aerial gunning.

9.      Guardians' staff, members, and supporters are dedicated to ensuring that Wildlife Services complies with all applicable federal laws. Wildlife Services' wildlife killing program in New Mexico, along with its associated 2006 Environmental Assessments and Findings of No Significant Impact for Predator Damage Management Program ("2006 EA/FONSI") and 2011 EA/FONSI for the New Mexico Aquatic Rodent Damage Management Program, adversely impact Guardians' interests in New Mexico's wildlife that could be killed by Wildlife Services— intentionally or unintentionally—including Mexican gray wolves, black bears, coyotes, mountain lions, bobcats, foxes, raptors, ravens, skunks, prairie dogs, and others. Guardians also has

members and supporters who are adversely affected by the threat that Wildlife Services poses to companion animals in New Mexico.

10.     Guardians' members and supporters live and recreate in or near areas in New Mexico where implementation of Defendants' wildlife killing program occurs for the purposes of hiking, observing wildlife, and other recreational and professional pursuits. Guardians' members and supporters enjoy observing, attempting to observe, photographing, and studying wildlife, including signs of those species' presence in these areas. The opportunity to possibly view wildlife or their signs in these areas is of significant interest and value to Guardians' members and supporters, and it increases the use and enjoyment of public lands and ecosystems in New Mexico.  Guardians' members and supporters have regularly engaged in these activities in the past, and they intend to continue to regularly do so in the upcoming months.

11.     Guardians' members and supporters have a procedural interest in ensuring that Wildlife Services' activities comply with all applicable federal statutes and regulations. Guardians has worked to reform Wildlife Services' activities throughout the United States, including in New Mexico. Guardians and its members and supporters have an interest in preventing Wildlife Services from being involved in lethal wildlife damage management, particularly predator control, and promoting the use of more effective and proactive nonlethal alternatives that foster communities' coexistence with wildlife.

12.     In sum, the interests of Guardians' members and supporters have been, and will continue to be, injured by Wildlife Services' wildlife-killing activities in New Mexico and its failure to comply with NEPA in implementing its Predator Damage Management Program and Aquatic Rodent Damage Management Program.

13.     The relief Guardians seeks in this complaint would redress the injuries of its members and supporters. The relief Guardians requests, if granted, would prevent Wildlife Services from engaging in predator damage management activities unless and until it complies with federal law. Guardians' requested relief, if granted, could reduce the amount of lethal predator control and other wildlife killing conducted in New Mexico. The New Mexico Department of Game and Fish, New Mexico Department of Agriculture, local municipalities, and private livestock producers cannot completely replace Wildlife Services' activities authorized through the 2006 EA/FONSI and 2011 EA/FONSI. Those entities do not have the equipment, such as fixed-wing aircraft for aerial gunning operations, or trained wildlife killing personnel utilized by Wildlife Services.

14.     Guardians' interests, and those of its members and supporters, have been, are being, and, unless this Court grants the requested relief, will continue to be harmed by Wildlife Services' actions and inactions challenged in this complaint. If this Court issues the relief requested, the harm to Guardians' interests, and of the harm to their members and supporters' interests, will be redressed.

15.     Defendant USDA ANIMAL AND PLANT HEALTH INSPECTION SERVICE ("APHIS") is an agency or instrumentality of the United States, within the USDA, whose Wildlife Services program is responsible for carrying out "predator damage control" and wildlife killings on behalf of the federal government in New Mexico and nationwide. Wildlife Services receives federal and cooperator funding to undertake wildlife damage management activities in New Mexico.

16.     Defendant JANET L. BUCKNALL is being sued in her official capacity as the Deputy Administrator of USDA APHIS's Wildlife Service's program.

**LEGAL BACKGROUND**

**I.     National Environmental Policy Act**

17.     Under NEPA, a federal agency must prepare an Environmental Impact Statement

("EIS") for "major Federal actions significantly affecting the quality of the human environment."

42 U.S.C. § 4332(2)(C). The human environment "shall be interpreted comprehensively to

include the natural and physical environment and the relationship of people with that

environment." 40 C.F.R. § 1508.14.

18.     "The NEPA process is intended to help public officials make decisions that are

based on understanding of environmental consequences, and take actions that protect, restore,

and enhance the environment." *Id*. § 1500.1(c). The CEQ "regulations provide the direction to

achieve this purpose." *Id*. To that end, "NEPA procedures must insure that environmental

information is available to public officials and citizens before decisions are made and before

actions are taken. The information must be of high quality. Accurate scientific analysis, expert

agency comments, and public scrutiny are essential to implementing NEPA."  *Id*. § 1500.1(b).

19.     To determine whether an action is significant—*i.e.*, whether an EIS is necessary

for the proposed action—an agency may first prepare an Environmental Assessment ("EA"). *Id*.

§ 1501.4(b). "Significance" determinations are governed by CEQ regulations, which require

agencies to consider both the context of the action and the intensity of the environmental

impacts. *Id*. § 1508.27. If the agency determines that a full EIS is not necessary, the agency must

prepare a finding of no significant impact ("FONSI"). *Id*. § 1501.4(e). A FONSI is a

"document…briefly presenting the reasons why [the proposed] action…will not have a

significant effect on the human environment." *Id*. § 1508.13.

20.     The environmental analysis must disclose and analyze the direct, indirect, and cumulative effects of the proposed action on the environment. *Id*. §§ 1502.16 (environmental consequences), 1508.7 (cumulative impacts), 1508.8 (direct and indirect effects), 1508.25(c)(3) (scope of impacts that must be considered).

21.     NEPA regulations allow for "tiering" of environmental reviews, when appropriate. Tiering is the process of incorporating by reference coverage of general matters in broader environmental impact statements, such as national program or policy statements, into subsequent narrower environmental analyses, such as regional or ultimately site-specific statements. *See* 40 C.F.R. § 1508.28. Although tiering to a previous EIS may be permissible, the previous document must actually discuss the impacts of the narrower program or project at issue.

22.     After preparing an EIS or EA, an agency may not simply rest on the original document. The agency must gather and evaluate new information that may alter the results of its original environmental analysis, and continue to take a hard look at the environmental effects of its planned actions. *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000); *S. Utah Wilderness All. v. Norton*, 457 F. Supp. 2d 1253, 1264 (D. Utah 2006) (citing *Dombeck*, 222 F.3d at 557).

23.     NEPA requires that a federal agency prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. *Id*. § 1502.9(d)(l)(ii).

## II.     Administrative Procedure Act

24.     NEPA does not contain an internal standard of review, therefore the APA governs judicial review.  Under the APA, courts "shall hold unlawful and set aside" agency action, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C.
§ 706(2)(A), (D).

25.     In addition, APA section 706(1) authorizes reviewing courts to "compel agency
action unlawfully withheld or unreasonably delayed." *Id*. § 706(1).

## FACTUAL BACKGROUND

### I.     Wildlife Services' Nationwide Wildlife-Killing Program

26.     Wildlife Services and its precursors have specialized in killing wildlife for more
than 100 years and are responsible for the eradication of wildlife like wolves, bears, and other
animals from much of the United States, particularly in the West. Wildlife Services contracts
with other federal agencies, non-federal government agencies, and private landowners.

27.     Wildlife Services kills approximately 1.3 million native animals every year in the
U.S. In 2019, Wildlife Services reported that it killed 303 gray wolves; 62,002 adult coyotes,
plus an unknown number of coyote pups in 251 destroyed dens; 364,752 red-winged blackbirds;
400 black bears; 308 mountain lions; 800 bobcats; 613 river otters; 2,667 foxes, plus an
unknown number of fox pups in 94 dens; and 24,817 beavers.

28.     Each year, Wildlife Services unintentionally kills thousands of nontarget animals.
The wildlife-killing program unintentionally killed roughly 2,700 nontarget animals in 2019,
including bears, bobcats, foxes, muskrats, otters, porcupines, raccoons, and turtles. Its killing of
nontarget birds included cardinals, ducks, eagles, herons, and turkeys. Dozens of domestic
animals—including companion animals and livestock—were also killed. These killings
undermine efforts to conserve and recover state and federally protected endangered wildlife,
which often need protection in part due to Wildlife Services' historic and ongoing practices.

29.     Former employees have alleged that Wildlife Services underreports the numbers of animals the agency kills. Therefore, the actual numbers of animals Wildlife Services has killed are likely greater than reported.

30.     Many of the species Wildlife Services targets play critical roles in ecosystems, and their removals result in a cascade of unintended consequences. The loss of top predators is well documented to cause a wide range of unanticipated impacts that are often profound, altering processes as diverse as the dynamics of disease, wildfire, carbon sequestration, invasive species, and biogeochemical cycles. In short, the removal of so many animals from the environment— especially predators—significantly alters native ecosystems directly, indirectly, and cumulatively.

31.     Many of the methods Wildlife Services uses—including snares; leg-hold and body-gripping traps; and gas cartridges—are fundamentally nonselective, environmentally destructive, inherently cruel, and often ineffective. For example, leg-hold traps are internationally recognized as inhumane and have been banned or restricted in many countries and the Unites States. Upon being trapped, animals frantically struggle to free themselves both by attempting to pull their trapped limb out of the device and by chewing at the trap itself or even their own limbs. The force of the jaws clamping on the animal's limb and the subsequent struggle result in severe trauma, including mangling of the limb; fractures; damage to muscles and tendons; lacerations; injury to the face and mouth; broken teeth; loss of circulation; frostbite; and amputation. Wildlife Services often fails to routinely check its traps. Thus, many animals experience prolonged suffering and sometimes eventually die of exposure.

//

///

11

**II.      History of NEPA Analysis of Wildlife-Killing Programs in New Mexico**

32.      In 1994, Wildlife Services prepared (and in 1997 amended) a Programmatic EIS

("1997 PEIS") to analyze its nationwide wildlife damage control program. This outdated

document relies on science from the 1970s and 80s, with some studies dating back decades

further. In fact, in 2016, Wildlife Services issued a formal notice acknowledging that the 1994

programmatic EIS is outdated, that the agency would no longer rely upon it, and that it intended

to redo or revise all the NEPA documents currently tiered to the 1994 PEIS. Since publicly

acknowledging the PEIS is woefully outdated, Wildlife Services has yet to initiate a new

comprehensive analysis that publicly evaluates the overall ecological and economical costs of its

nationwide wildlife damage control program according to current science and data.

33.      In 1997, Wildlife Services also issued three EAs/FONSIs for its Predator Damage

Management Program in New Mexico, one for each of the three Wildlife Services districts in the

state—Albuquerque, Las Cruces, and Roswell. Each EA in turn tiered to the 1994 PEIS.

34.      In 2006, Wildlife Services issued an EA for "Predator Damage Management in

New Mexico." According to Wildlife Services, this EA's purpose was to "combine the 3 EAs

into one comprehensive statewide EA." The 2006 EA incorporated analysis from the three 1997

EAs and the 1997 PEIS. The same year, Wildlife Services issued a FONSI and signed a decision

for its PDM Program in New Mexico, which authorized the agency to continue killing coyotes,

striped skunks, bobcats, cougars, black bears, and others at the request of the state wildlife

agency (New Mexico Department of Game and Fish) and livestock owners, by means of

shooting, snares, aerial gunning (shooting fleeing coyotes from airplanes or helicopters), denning

(gassing coyotes dens), and M-44 sodium cyanide bombs.

35.     In New Mexico, the 2006 Predator Damage Management Program EA/FONSI authorizes Wildlife Services' statewide involvement in predator-killing programs. The 2006 EA/FONSI authorizes the use of leg-hold traps, cage traps, neck snares, ground shooting, hunting dogs, aerial hunting, M-44s (sodium cyanide "bombs"), livestock protection collars filled with Compound 1080 (sodium fluoroacetate), gas cartridges (to kill animals in dens), and more.

36.     Target species listed in the 2006 Predator Damage Management Program EA include coyote, cougar, red, swift, and kit foxes, black bear, bobcat, raccoon, badger, opossums, weasels, mink, martens, ringtails, skunks, and white-nosed coati.

37.     Wildlife Services' 2006 EA for its New Mexico PDM program also relies on an outdated 1992 programmatic Biological Opinion from the U.S. Fish & Wildlife Service (USFWS) (updated in 1999 to address jaguar after the species was federally listed as endangered in 1997) and a 2003 Biological Assessment and corresponding letter of concurrence from the USFWS for its analysis of potentially adverse effects to federally listed threatened and endangered species.

38.     In 2011, Wildlife Services issued a separate EA/FONSI for its "New Mexico Aquatic Rodent Damage Management" ("ARDM") program. This 2011 EA extensively incorporates analysis from a previous 2004 ARDM EA and the 1997 PEIS. Furthermore, like Wildlife Services' 2006 EA for its PDM program, the 2011 ARDM EA also relies on even more outdated analyses (*i.e.* consultations with the USFWS from the early 2000s and a corresponding 2003 Biological Opinion) for determining the potential adverse effects of Wildlife Services' ARDM program, including both beaver killing and beaver dam removal, on federally listed threatened and endangered species that inhabit aquatic ecosystems and/or are dependent upon

riparian areas, such as the New Mexico meadow jumping mouse, southwestern willow flycatcher, Chiricahua leopard frog, Northern Mexican gartersnake, Jemez Mountains salamander, and Rio Grande silvery minnow.

39.     Both the 2006 EA/FONSI and the 2011 ARDM EA/FONSI report that Wildlife Services also unintentionally killed several nontarget animals from 1998–2004 in New Mexico, including gray, red, swift, and kit foxes, porcupines, striped skunks, badgers, mountain lions, javelina, bobcats, mule deer, and black bears.

40.     The 2006 Predator Damage Wildlife Program EA/FONSI for Wildlife Services' PDM Program in New Mexico covers the entire state. According to this EA, as of January 1, 2003, Wildlife Services had active agreements to conduct predator damage management on about 24.8 million acres in New Mexico—or about 32% of the state's surface area. Fifty-four percent of the land under agreement was privately-owned in 2003, or about 13.9 million acres. Next in line in terms of acreage was U.S. Bureau of Land Management ("BLM")-managed lands to the tune of 6.7 million acres, followed by 2.9 million acres of state lands—including state trust lands—and 0.9 million acres of U.S. Forest Service ("USFS")-managed lands. Wildlife Services also had agreements to kill predators on about 400,000 acres of "other" lands such as military installations, Tribal lands, and municipal lands.

41.     The 2011 EA/FONSI for Wildlife Services' ARDM program in New Mexico covers the entire state to the extent an area has habitat that supports beavers.[3] According to this 2011 EA, Wildlife Services had active agreements at the time of the EA's issuance to conduct beaver control activities on about 1.25 million acres throughout New Mexico, including on state

---

[3] The 2011 ARDM EA/FONSI also covers nutria, a species introduced to New Mexico in the early 1930s. However, Wildlife Services does not ordinarily kill nutria and this Complaint does not challenge Wildlife Service's treatment or analysis of nutria in New Mexico.

and federal public lands. According to its website, the number of beavers killed by Wildlife Services has fluctuated greatly over the past decade, *e.g.*, 23 reported in 2012; 57 reported in 2013; 2 reported in 2014; 11 reported in 2015; 2 reported in 2016; 0 reported in 2017 and 2018; and 5 reported in 2019. This kill data does not account for the number of beaver dam removals carried out by Wildlife Services and are also in addition to beaver killing and dam removal carried out by the New Mexico Department of Game and Fish (NMGF) and private landowners in response to reported property damage, as well as beavers killed for their fur under state hunting/trapping licenses.

42.     As of the date of this Complaint, Wildlife Services has not supplemented its 2006 or 2011 EAs. Indeed, Wildlife Services has never prepared a comprehensive EIS analyzing the impacts of its wildlife killing programs in New Mexico and instead continues to rely on the outdated 2006 and 2011 EAs that tier to the 1997 PEIS—a document Wildlife Services has disavowed without updating.

43.     Wildlife Services continues to kill thousands of animals in New Mexico every year. In 2018, Wildlife Services reported killing 2,650 coyotes, 519 striped skunks, 1,103 black-tailed prairie dogs, 18 gray and kit foxes, 2 mountain lions, 1 black bear, and thousands of other animals in New Mexico. In 2019, Wildlife Services reported killing 2,808 coyotes, 1,595 black-tailed prairie dogs, 419 striped skunks, 23 gray, swift and kit foxes (**17** of which were "unintentional"), 2 mountain lions, 1 black bear, and thousands of other animals in New Mexico. Wildlife Services has also killed nearly 100 beavers since it issued the ARDM in 2011.

//

///

////

15

### III.   New Information and Circumstances Affecting Wildlife-Killing Programs in New Mexico

44.    Since Wildlife Services prepared its 2006 PDM EA/FONSI and the 2011 ARDM EA/FONSI, new information and circumstances demonstrate that supplemental NEPA analysis is required for the agency's wildlife killing programs in New Mexico.

45.    Numerous studies published in the last 15 years call into question Wildlife Services' presumption that killing predators effectively protects commercial livestock in the long-term. For example, a well-regarded 2014 study by Wielgus and Peebles found that killing predators to protect livestock can backfire and may *increase* livestock depredation.[4] Other studies[5] found little or no scientific support for the proposition that killing predators such as wolves, mountain lions, and bears reduces livestock losses over time.

46.    Moreover, many of the species that Wildlife Services targets play critical ecological roles, yet the 2006 PDM EA never assessed the cascading effects of removing predators from their native ecosystems. Indeed, for certain species and actions the 2006 PDM EA rests on science from the years immediately following World War II to justify its predator killing program. Undeniably, significant new developments have occurred in the science of wildlife management in 70 years. For example, it is now well established that killing predators such as coyotes, mountain lions, and bears create conditions favorable for pandemics to emerge, diminish ecosystem functions, reduce carbon sequestration, and increase instances of irruptions of invasive species, and cost taxpayers millions—and perhaps billions—of dollars in lost

---

[4] R. B. Wielgus & K. A. Peebles, *Effects of wolf mortality on livestock depredations*, PLoS One, 9, 1–16 (2014).
[5] L.M. van Eeden et al., *Carnivore conservation needs evidence-based livestock protection*, PLOS Biology 16(9): e2005577 (2018); A. Treves et al., *Predator control should not be a shot in the dark*, Frontiers Ecology & Env't. 14, 380–388 (2016).

ecosystem services.[6] Numerous studies have been published since the PDM EA was developed demonstrating that removing apex and mesopredators such as mountain lions and coyotes results in a "trophic cascade" of unintended consequences and wide-ranging adverse ecological effects.[7] For example, the 2006 PDM EA never addressed the myriad environmental effects of lethally removing large numbers of coyotes from native ecosystems.

47.     In an arid region such as New Mexico, which is undergoing rapid ecological changes from climate disruption,[8] it is more important than ever that Wildlife Services takes a hard look at the environmental consequences of removing so many animals critical to regulating ecosystems. The Fourth National Climate Assessment predicts that climate disruption will lead "to aridification (a potentially permanent change to a drier environment) in much of the Southwest, through increased evapotranspiration, lower soil moisture, reduced snow cover, earlier and slower snowmelt, and changes in the timing and efficiency of snowmelt and runoff."

48.     Supplemental analysis is therefore necessary to address both the ecological impacts of removing coyotes, cougars and other predators from their native ecosystems and the cumulative effects to New Mexico's sensitive ecosystems which depend on functional predator-prey relationships, such as the well-documented decreases in songbird and rodent diversity

---

[6] Bradley J. Bergstrom et al., *License to Kill: Reforming Federal Wildlife Control to Restore Biodiversity and Ecosystem Function*, 7 CONSERVATION LETTERS 131 (2014); J.A. Estes et al., *Trophic Downgrading of Planet Earth*, 333 SCIENCE 301 (2011).

[7] W. J. Ripple & R. L. Beschta, *Trophic cascades in Yellowstone: The First 15 Years after Wolf Reintroduction*, BIOL. CONSERVATION 145, 205–213 (2012); W. J. Ripple et al., *Trophic Cascades from Wolves to Grizzly Bears in Yellowstone*, J. ANIM. ECOL. 83, 223–233 (2014); R. L. Beschta et al., *Riparian Vegetation Recovery in Yellowstone: The First Two Decades after Wolf Reintroduction*, BIOLOGY CONSERVATION 198, 93–103 (2016); Taal Levi et al., *Deer, Predators, and Lyme Disease*, PROC. OF THE NAT'L ACAD. OF SCI., 109 (27) 10942–947 (2012); B. J. Bergstrom et al., *supra* note 5, at 131–142.

[8] FOURTH NATIONAL CLIMATE ASSESSMENT, U.S. Global Change Res. Program (2018), https://nca2018.globalchange.gov/ (last accessed July 22, 2020).

where Wildlife Services exterminates coyotes.[9] To take another example from among the many, the extermination of coyotes from New Mexico impacts numerous species including federally-listed threatened and endangered species such as the black-footed ferret, yellow-billed cuckoo, the southwestern willow flycatcher, the New Mexico meadow jumping mouse (which USFWS listed as endangered almost a decade after the EA issued), and the Gila trout. The 2006 PDM EA does not mention any of the latter four species. Recent science unequivocally indicates that removing mountain lions, coyotes, foxes, and other mesopredators from ecosystems could significantly impact all four of these critically imperiled species and many other native species as well. Wildlife Services can and must do better. Indeed, NEPA requires that it does.

49.     Like the 2006 PDM EA, Wildlife Services' 2011 ARDM EA/FONSI also fails to adequately consider modern science's well-established conclusions regarding beavers and their highly beneficial effects on ecosystems.[10] Beavers act as ecosystem engineers, increasing biodiversity and ecosystem function—including filtering drinking water and removing water-borne pollutants—where they are native.

50.     Just as with predators, several threatened and endangered species depend on native beaver-engineered ecosystems to survive. First among them is the New Mexico meadow jumping mouse. Indeed, USFWS listed the jumping mouse as endangered in 2014, three years after the 2011 ARDM EA/FONSI issued. As USFWS reported when it designated the jumping mouse's critical habitat in early 2016, the mouse depends on riparian and—especially—wet meadow habitat to thrive. Yet, the 2011 EA/FONSI failed to take the requisite hard look at the

---

[9] Gary W. Roemer et al., *The Ecological Role of the Mammalian Mesocarnivore*, 59 BIOSCIENCE 165 (2009); Kevin R. Crooks & Michael E. Soulé, *Mesopredator Release and Avifuanal Extinctions in a Fragmented System*, 400 NATURE 563 (1999).
[10] Alan Law, *Are Beavers a Solution to the Freshwater Biodiversity Crisis?*, 25 DIVERSITY AND DISTRIBUTIONS 1763 (2019).

impacts of killing beavers and removing their dams on this imperiled riparian area-dependent species, summarily concluding there would "no effect" to the jumping mouse. Wildlife Services must supplement the 2011 ARDM EA to provide an actual analysis, based on current science, to support its findings regarding the environmental impacts of its beaver-killing program on the now federally-listed endangered New Mexico meadow jumping mouse.

51.     At the time of the 2006 and 2011 EAs, Wildlife Services also lacked sufficient population data for most target animals (*i.e.*, coyotes, kit and swift foxes, bobcats, white-nosed coati, and mountain lions) to provide accurate statewide population estimates for these species. And the population estimates that the 2006 and 2011 analyses did include are now severely outdated. Current, accurate statewide population status and trend data is thus necessary for Wildlife Services to adequately evaluate the degree of current impacts from its New Mexico wildlife killing programs.

52.     For instance, the swift fox was once a severely <u>endangered species</u> due to predator control programs in the 1930s that were aimed mostly at eradicating gray wolves and coyotes. Though the USFWS removed the swift fox from its list of candidate species for listing under the Endangered Species Act in 2001, states like New Mexico where the species occurs were supposed to carefully monitor swift fox populations. Yet, despite allowing the swift fox to be harvested for its fur, NMFG has failed to adequately gather current statewide population estimates for the species. Making matters worse, foxes are among the species most frequently killed as unintentional targets of M-44 sodium cyanide bombs, traps and snares. For instance, of the 23 foxes Wildlife Services killed last year in New Mexico, 17 were listed as unintentional, including 7 swift foxes.

53.     The number of certain target animals that Wildlife Services has killed in recent years has also changed since Wildlife Services prepared its 2006 PDM EA. In some cases, those figures have dramatically increased. For instance, Wildlife Services reported killing 2 ravens statewide in 2007. In 2018, that number had jumped to 52 ravens.

54.     Furthermore, many native species that Wildlife Services currently kills or has recently killed have been essentially left out of any finalized NEPA analyses or decisional documents. For example, Wildlife Services expressly declined to analyze the impact of its PDM Program on the black-tailed jackrabbit in the 2006 EA/FONSI because of the low numbers of take in the years leading up to 2006. Yet, clearly things have changed. In 2007, Wildlife Services reported killing no black-tailed jackrabbits. In 2017, Wildlife Services killed 434, 35 of which it killed by cruelly spotlighting them at night. By 2019, that number climbed even higher to a total of 558, 3 of which were "unintentionally killed" by snares. Wildlife Services additionally reported killing many small mammals such as numerous species of prairie dogs and squirrels that also were not part of any prior NEPA analyses.

55.     In addition, new information regarding the cost-effectiveness of predator control has emerged since the 1990s. For example, one recent study published a literature review of economic analyses of predator control.[11]  To date, Wildlife Services has yet to issue a comprehensive analysis of the cost-effectiveness of its Predator Damage Management Program in New Mexico. Such a comprehensive analysis should weigh the costs of carrying out the program against the cost of predator-related livestock losses as compared to non-predator related livestock losses (e.g., weather and disease). Indeed, Wildlife Services itself has long known that coyote populations increase the more it exterminates them, and yet continues to kill more than

---

[11] B.S. Rashford, et al. *Economic Analysis of Predator Control: A Literature Review*, U. OF WYO. BULL., B-1208 (2010).

68,000 coyotes every year in the United States, including between 2,000 to 4,000 in New Mexico every year.[12] Moreover, Wildlife Services represents in the 2006 FONSI that it could kill up to 70% of the coyote population in some places in New Mexico. Wildlife Services must reexamine its Kafkaesque bureaucratic "reasoning" of continually ignoring modern science and economics in order to spend millions of dollars every year on futilely killing a native species well-known for its compensatory breeding capacity. Wildlife Services should, at the least, tally up the costs and benefits—given the ample significant new information—so that the public, agency decision-makers, and Congress can better understand just how wasteful the Predator Damage Management Program really is.[13]

56.     Moreover, Wildlife Services failed to fully consider the beaver's profound economic impact on New Mexico's ecosystems. One method Wildlife Services can use to discuss the beaver's impact is through an ecosystem services analysis. This methodology has undergone much refinement since the 2011 EA issued. In essence, ecosystem services translates the goods and services healthy ecosystems provide humans into dollar amounts.[14] The dollar amounts give federal agencies tangible values to conduct cost-benefit analyses. For example, the

---

[12] Eric M. Gese, *Demographic and Spatial Changes of Coyotes to Changes in Food and Exploitation*, PROC. OF THE 11TH ANIMAL DAMAGE MGMT. CONF. (2005), https://www.aphis.usda.gov/wildlife_damage/nwrc/publications/05pubs/gese056.pdf (last accessed July 20, 2020).

[13] Indeed, several leading national and international organizations have identified biodiversity loss as a leading threat to economic well-being and sustainability of human communities. *See Global Risks Report*, WORLD ECON. FORUM 45–58 (Jan. 15, 2020), https://www.weforum.org/reports/the-global-risks-report-2020.

[14] *Ecosystem Services*, ENVTL. PROT. AGENCY, https://www.epa.gov/eco-research/ecosystem-services (last accessed July 21, 2020). USFS incorporated ecosystem services into its 2012 Planning Rule. *See* https://www.fs.fed.us/emc/economics/applications.shtml.

worldwide value of insect pollination—a crucial aspect of our modern food-supply system—is valued at between 235 billion and 577 billion dollars per year.[15]

57.     Beavers, due to their beneficial engineering of ecosystems provide outsized ecosystem services. One study, conducted in southern Utah, a landscape analogous to much of New Mexico, found that in terms of wetland habitat only, a mere 2,560 beavers in the lower Escalante River basin would provide $275.5 million dollars per year in wetland habitat services.[16] If riparian and aquatic habitat services are added to that number, it becomes nearly $450 million dollars per year.

58.     Finally, the 2006 EA and 2011 EAs did not consider the potential detrimental effects of Wildlife Services' programs on the economic values of native carnivores and beaver habitat to New Mexico's non-consumptive wildlife-related industries (*i.e.*, tourism). Beavers and native carnivore species support healthy, abundant biodiversity in a region known for such qualities. Beavers particularly can have remarkable impacts on reforestation in areas affected by wildfires. Moreover, beavers play an important role in habitat restoration for threatened Gila trout. Indeed, state and federal agencies partnered with a local sport fishing group to construct "beaver dam analogs" in the Gila Wilderness in order to nurture the Gila trout back to health.[17] Supplemental NEPA analysis is thus necessary to provide a credible cost-benefit analysis of Wildlife Services' killing programs in New Mexico. *See e.g.* 40 C.F.R. § 1502.23.

---

[15] *The Value of Pollinators to Ecosystems and our Economy*, FORBES (Oct. 14, 2019), https://www.forbes.com/sites/bayer/2019/10/14/the-value-of-pollinators-to-the-ecosystem-and-our-economy/#7fdfc8917a1d.
[16] *The Economic Value of Beaver Ecosystem Services*, ECONNORTHWEST (2011), http://www.martinezbeavers.org/wordpress/wp-content/uploads/2011/03/ECONW-Escalante-Beaver-Values-Report-0211.pdf (last accessed July 22, 2020).
[17] *Restoring a Future with Gila Trout*, TROUT UNLIMITED (Mar. 4, 2020), https://www.tu.org/blog/restoring-a-future-with-gila-trout/.

59.     New information raising ethical concerns about the practices of some Wildlife Services staff has also emerged since the 1990s. For example, in 2012, the Sacramento Bee published a series of articles exposing the practices of Wildlife Services. This series described ethical problems within the agency, including employees hiding killings of nontarget animals. The Sacramento Bee also reported that a Wildlife Services employee based in Wyoming posted photographs online of his dogs attacking coyotes caught in leg-hold traps, and that Wildlife Services did not discipline the employee.

60.     Further, just recently USFWS expressed serious concerns over the legitimacy of Wildlife Services' livestock depredation investigations in Arizona and New Mexico, in relation to losses Wildlife Services' questionably attributed to endangered Mexican gray wolves.[18] The results of Wildlife Services' depredation investigations are used by livestock producers to collect compensation for wolf-caused losses. Wildlife Service's investigations also form the basis of USFWS's decisions on whether to kill or remove Mexican gray wolves from the wild in response to alleged livestock depredations. USFWS's concerns followed a recent, in-depth review by Western Watersheds Project documenting "significant oddities, errors or conflicting details in more than two-thirds of the 117 investigations it reviewed from 2019."[19] Wildlife Services claims to have recently changed its depredation protocols, allegedly requiring greater oversight from Wildlife Services' supervisors over its field officer's investigations, in response to USFWS's concerns.[20]

---

[18] *See e.g.,* Henry Brean, *Advocates question investigations used to target 'problem' wolves*, The Arizona Daily Star (May 29, 2020), https://tucson.com/news/state-and-regional/advocates-question-investigations-used-to-target-problem-wolves/article_eea3485a-adf0-5bee-b5dd-e44d5a74845b.html

[19] *Id.*

[20] Wildlife Services-New Mexico Monthly Newsletter (July Updates)

61.     After Wildlife Services released the 2006 and 2011 EAs, the Environmental

Protection Agency issued new restrictions to protect endangered species that could be harmed by

Wildlife Services' use of gas cartridges to kill denning animals. In the last decade, several M-44s

placed by Wildlife Services have poisoned people, nontarget wildlife, and family dogs.  Rising

concerns about the harm caused by these indiscriminate devices has led to multiple states—

including Oregon, California, and Washington—banning their use, in addition to the introduction

of federal legislation for a national ban of sodium cyanide devices (HR 2471/S 1301). Despite

these concerns, New Mexico Wildlife Services has continued to use these dangerous devices in

the state. In 2019, M-44s killed 612 coyotes in New Mexico and were responsible for the

"unintentional" take of 5 gray foxes and 4 kit foxes.  In the 2017 and 2018, collectively, M-44s

were responsible for the "unintentional" take of 10 gray foxes and 12 kit foxes, and 2 swift

foxes.  Only 4 gray foxes, 1 swift fox, and no kit foxes were intentional take by Wildlife Services

in either year, highlighting a major concern with the use of M-44s.  A supplemental NEPA

analysis must analyze the unintended impacts of M-44s and determine whether Wildlife Services

should continue to use these dangerous devices in New Mexico.

62.     A variety of nonlethal, alternative methods have been successfully used to prevent

wildlife conflicts and protect livestock from predators, as confirmed by numerous recent

studies.[21]

63.     Further, after the issuance of the 2006 PDM EA, USFWS issued a Recovery Plan

for the Black-footed ferret in 2013, which remains one of the most endangered animals in the

world. As that 2013 Recovery Plan notes, lethal control of coyotes may further impact ferret

[21] John A. Shivik et al., *Nonlethal Techniques for Managing Predation: Primary and Secondary Repellents*  (2003); N.J. Lance et al., *Biological, Technical, and Social Aspects of Applying Electrified Fladry for Livestock Protection from Wolves (Canis lupus)* (2010).

survival, possibly due to rapid rates of recolonization of coyotes after removal. While the 2006 PDM EA contemplates the theoretical reintroduction of the Black-footed ferret, it does not analyze in any depth what impacts (direct, indirect, or cumulative) the slaughter of 2,000–4,000 coyotes would have on this endangered species. Now that black-footed ferrets are back in New Mexico in several locations, Wildlife Services must supplement the 2006 PDM EA accordingly.

64.    Documented sightings of jaguars in New Mexico have also increased since Wildlife Services prepared its 2006 PDM EA. Yet, Wildlife Services has not consulted with USFWS over potential impacts of its New Mexico PDM program on this endangered species since 1999.

65.    For all the reasons explained above, Wildlife Services' 2006 and 2011 EAs/FONSIs for its PDM and ARDM programs are now outdated. Wildlife Services can no longer reasonably rely on these documents without supplementing the NEPA analyses using recent scientific information. Indeed, Wildlife Services itself acknowledged the necessity of new analysis in 2016 when it announced it would redo all environmental assessments relying on the outdated documents and undertake a new NEPA process for its New Mexico program.

## CLAIM FOR RELIEF

### NEPA and APA Violation: Failure to Supplement Outdated NEPA Analyses

66.    Guardians re-alleges and incorporates by reference the preceding paragraphs into the claim set forth below.

67.    An agency has a continuing obligation to comply with NEPA and must prepare a supplemental NEPA document when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts" emerge. 40 C.F.R. § 1502.9(d)(l)(ii).

68.     Well over two decades have passed since Wildlife Services completed the 1994 PEIS (amended in 1997) and almost 15 years since Wildlife Services issued its 2006 EA/FONSI for its New Mexico PDM program. Those analyses are now outdated. Wildlife Services can no longer reasonably rely upon the analyses in these stale documents. Wildlife Services must supplement the NEPA analyses in the 1994/1997 PEIS and 2006 PDM EA or prepare a new EA or EIS for its New Mexico PDM program.

69.     Circumstances have changed and new information has also since Wildlife Services prepared its 2011 EA for the New Mexico ARDM program. Wildlife Services must supplement the 2011 EA or prepare a new NEPA analysis that incorporates new scientific information that has emerged since the 2011 EA in relation to the negative ecological consequences of beaver killing and beaver dam removal.

70.     Wildlife Services violated and continues to violate NEPA by relying on and tiering to its 1994/1997 PEIS and the 2006 and 2011 EAs/FONSIs for its New Mexico PDM and ARDM programs.

71.     Wildlife Services' failure to supplement its NEPA analysis in its 1994/1997 PEIS, the 2006 EA/FONSI for its Predator Damage Management Program in New Mexico, the 2011 EA/FONSI for its Aquatic Damage Management Program, and its failure to limit or halt its ongoing activities while completing new analyses, as NEPA requires, is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed. 5 U.S.C. §§ 706(1), (2). These actions and inactions caused or threaten to cause serious prejudice and injury to Guardians' rights and interests.

//

//

## REQUEST FOR RELIEF

WHEREFORE, Guardians requests that the Court:

A.       Declare that Wildlife Services has violated and is violating NEPA, 42 U.S.C. §§ 4321–4347, and the implementing CEQ regulations, 40 C.F.R. §§ 1500–1508, by failing to supplement its outdated NEPA analyses governing its Predator Damage Management Program and Aquatic Rodent Damage Management Program in New Mexico;

B.       Declare that Wildlife Services' failure or refusal to supplement its outdated NEPA analyses and its failure to halt or limit its ongoing activities while completing the new analysis is arbitrary, capricious, an abuse of discretion, not in accordance with law, and constitutes agency action unlawfully withheld or unreasonably delayed under section 706 of the APA;

C.       Order Wildlife Services to complete the required supplemental NEPA analysis by a reasonable date certain;

D.       Enjoin Wildlife Services and its agents from implementing the challenged Predator Damage Management and Aquatic Rodent Damage Management Programs unless and until the violations of federal law set forth herein have been corrected to the satisfaction of this Court;

E.       Award Guardians its attorneys' fees and costs in this action pursuant to 28 U.S.C. § 2412; and

F.       Grant such other and further relief as the Court deems just and proper.

//

//

//

27

Respectfully submitted this 8th day of October 2020,

*/s/ Samantha Ruscavage-Barz*
Samantha Ruscavage-Barz
WildEarth Guardians
301 N. Guadalupe Street, Suite 201
Santa Fe, NM 87501
(505) 401-4180
sruscavagebarz@wildearthguardians.org

*/s/ Jennifer Schwartz*
Jennifer Rose Schwartz
WildEarth Guardians
P.O. Box 13086
Portland, OR 97213
(503) 780-8281
jschwartz@wildearthguardians.org
(Appearing by association with Federal Bar
member Samantha Ruscavage-Barz pursuant to
L.R. 83.3(a))

*Counsel for Plaintiff*